May it please the court, Randall Winnett on behalf of Officer Dillard. If I could, I'd like to reserve two and a half to three minutes for purposes of rebuttal. Keep an eye on the clock. You will have to be your own reserver. Okay. Thank you, Your Honor. Your Honor, this case involves first an issue of qualified immunity. And in dealing with the issue of qualified immunity in this case, we look at the two Saussure v. Katz facts. The first question is whether there is a violation of a constitutional right. And the district court in this case immediately reviewed, immediately decided, if the court reviews her opinion, that there was no connection between the issue of there being domestic violence and these events. And the clear evidence shows that there was. Not only do we have the situation involving Officer Dillard, who receives, first of all, a domestic violence call that involves a black male, which causes him to then go to the Escondido campus. He's at the campus for that purpose. When another call is made saying there is an individual, a male, wearing a purple shirt, pushing a woman in the back by the conic boxes. What's the link between those two calls? When did the first call come in? The first call was at 3.42, 15.42, while the officer was not at the campus. Right. And then the officer goes to the campus, meets with the administrator, and by the time that they are searching and go to the back, it's 4.19. So roughly between the time that he gets the first call at 3.42 and the time he's back there, there's a half hour that goes by. He has to go from... Thirty minutes. And so who called it a domestic violence incident? Well, it was dispatched that way. And I think what's also very important here is the district court did not take into account additional evidence. We have the community service officer, Montez, who was present, who also heard the radio call. His testimony is contained in the appellate excerpt record. Specifically, his report is at page 229, and it references the call that he heard involving the man in the purple shirt involved domestic violence. And then specifically, his testimony is also in the record, and that's at page 222. Is it your position that the nature of the call, domestic violence, gave Officer Dillard reasonable suspicion to believe that Thomas was armed? May be armed. May be armed. May be armed. The answer... Do you have any authority for that? Is there any case that so says? Yeah. The answer is there's not a specific case that has that directly on point, but there are cases that reference the fact that when an officer is investigating and addresses a situation involving suspicious activity, and that he believes that based upon the call being made and the activity, that he has the right to search and request a search for weapons because that person may be armed and dangerous. But you seem to be saying because, and I read his testimony, he has this mantra that this is domestic violence, and as soon as he heard those words, his assumption was that he had the search for weapons because generically, any time he gets a report of domestic violence, then his principal concern is for officer safety and the safety of those around him. So it seems to me, Counsel, what you're arguing for is a categorical classification of domestic violence as the kind of potential crime that's being investigated where there's an automatic presumption that the offender, the suspect, may be armed and that therefore, regardless of what the officer finds at the time, because I've read his testimony and he said on the objective facts that he observed at the time, he didn't think he was, there was nothing about him that suggested he was armed other than there was the fluttery movements of his hands and the fact that he was pushing back about being searched. So what is the category that, or the case that says domestic violence carries with it the presumption of reasonable suspicion for searching for arms? Your Honor, I believe that in trying to make it a category, you're oversimplifying it. Well, that's what he did. Well, no, I don't believe so. Well, that's what he kept saying. He said even before he got there. We have the totality of circumstances, which not only do we have a reference to domestic violence based upon his call and the call of the community service officer, but we have the information that's being provided on that call, which is we have a black male wearing a purple shirt who pushed a female by the conics boxes. Okay, but where's the domestic violence in that? That's an assault on a person, a woman. That could be a sexual assault. It could be that. Well, which sexual assault would be domestic violence? Well, by whose definition? I think by almost anyone's. That's domestic violence if you sexually assault somebody. If you sexually assault your girlfriend, that is domestic violence. That's a categorical crime. Well, it's, Your Honor, it's one of those things where it's not just simply... that there's a residence involved. I mean, that's how originally it began to arise, the term domestic violence, domestic in the sense, you know, domicile and the like. Matos is a example of a domestic violence case. And in fact, because it was a domestic violence case, you're saying, okay, even then we recognize that Matos, the risk of domestic violence cases being highly charged, danger to the officers, I get all that. But here we have a campus, a situation where the actual conduct is described as a college campus. And he's saying, okay, the magic words were described to me on the call before he got the second call. He's saying at that point, even before he got there, his policy was in, quote, domestic violence cases, always, always to search for weapons because of the statistics about violence to police. So that seems to be what this officer had in mind that he brought to the scene. And I'm trying to understand, well, okay, we have to, in terms of qualified immunity, we have to step back and say, would any reasonable officer have assumed that there was a need for a search under these circumstances that he saw at the scene? And what I'm saying is the totality of the circumstances tell that. Not only his call, but the community service officer's call said this specific event involving the male involved domestic violence. You're just not answering my question. That's a label. What did they see at the scene? What did they see? They saw a man, a black male in a purple shirt that covered his waist area, come out, and he was startled, and he was fidgety. Startled, and that's what your client said. That's a normal reaction. Whenever I, you know, you see a police officer, that's a common reaction.  Where the reasonable suspicion under a Terry analysis says in our, all the case law that's emerged since then that says you have to have some kind of objective basis on facts that you can talk about totality. And I kept searching for what are the facts that he, on the ground that he relied on, besides the label of domestic violence. And he, as you are, he keeps coming back to this was domestic violence. So that was my basic concern. There's a matching of the description of the individual who pushed the female, who came out from the area in which they made the call. So those are the additional information. Those are the additional facts. Counsel, Terry makes it clear. There are two questions of reasonable suspicion. One is the suspicion to stop, to investigate. Okay, there's the match. I got it. Then it says, now we have to decide whether there's reasonable suspicion to frisk, not to search, frisk, to pat down. Okay, it's not a search, right? Because it's for officer safety. Correct. Okay, and I'm not sure your client made that distinction. But in any event, because he never got to do anything except tase the guy into basically submitting to the search demand. He actually explained it to him. He said, first of all, it's a suspicious activity. And then when the search did not occur, he said, I got a call involving a man with a purple shirt pushing a female. And I need to check you for weapons. The individual had a purple shirt hanging over a shirt, hanging over his pants. And he wanted to make sure the situation was safe. He would be remiss if he just turned away and walked away. He would be remiss on what? Based upon the fact that he and the community service officer got the domestic violence call and had information that that individual wearing the purple shirt had pushed a female back by the area where he located them. So based upon that, we do not believe there's a constitutional violation. Second of all, let's assume there is. The second point, which really wasn't even addressed by the trial court, had to do with is, is this a right at issue that was clearly established? His ability to tase. No, you skipping over was, was it a right clearly established to search him? To make the demand. Well, I think, I think there are actually two different issues. If we look at both Matos and Brian, in both of those cases, they said the, the, there was a constitutional violation, but the right itself to tase at that point was not clearly established. You're jumping ahead to the use of force to enforce what was a demand to search. I'm trying to understand what your argument is to avoid a constitutional violation in demanding the search in the first place. I understand. I understand. But I have, I have limited time. And what I'm trying to say is, is it's a two part test and either part provide the officer immunity. And it wasn't clearly established that he didn't have the right to tase in these circumstances. Before you get to tasing, tell us what the reasonable grounds were for arresting and frisking. All right. The reasonable grounds where he received a, a call of domestic violence. Now that goes on the violation issue. Do you want to talk about qualified immunity? Yes. Is it part of your argument that there's no clearly established law saying that a police officer cannot search for weapons in response to a domestic violence call? That's true. Well, then say that. That's true. Okay. I apologize. I apologize. I know we're getting too involved sometimes in the facts, but that is true. Good idea sometimes. All right. I apologize. Now, I have limited time. And the other issue I wanted to discuss here, and it hasn't been made too much in light, but that is, is the court's actual granting of summary judgment to the plaintiff on these facts. In other words, in that situation, the facts on plaintiff's summary judgment motion, they have to be interpreted in light of the non-moving party, us. And to say that this is not, there's no issue for the jury on these facts as to whether there is a, a, a violation and whether or not the law provides this is, is actually contrary to the facts. And so what I, what I'd like to finally argue is, is the simple fact that summary judgment on behalf of the plaintiff, there are genuine issues of material fact that, that the court should not have granted summary judgment. Like what? What issue of material fact is triable? Well, one of the issues has to do with, with the issue of the domestic violence. The court said it wasn't tied in at all. The information is, yes, it was. The, the court said, the officer did not see any signs of there being weapons. Well, that didn't, that didn't take into account that the shirt was over the pants. The, the court did not take into account the, the issue of. But Mr. Dillard in his testimony said he saw no objective signs of the man being armed. But. In his deposition. Right. You couldn't see any weapons, but you take, if you take a look at the photos that are attached to the transcript. Well, that's how you look at them, but that's not how Dillard looked at them. No, no, he was just simply asked, did he see any weapons or signs of weapons? Did he have any suspicion that the man was armed? And he said, the only reason I wanted to, to search him was because it was a domestic violence call. I decided to search him before I even saw him. He said, based upon the call. Yeah, he was, he, he believed that he needed to. What other tribal issues are there? Tribal issues of fact, you have, you have experts who, who have provided declarations that are completely ignored. You have. What facts do the experts state that create material tribal issues under rule 56? I, I feel like I'm repeating myself and I apologize. I don't mean to be doing that, but the facts, the facts are, is whether, whether it was believed that this was a domestic violence call, whether in fact there was a call involving domestic violence, whether the fact the, the person matched that description, whether in fact he did push Ms. Husky and, and that the information provided was accurate. And based upon the circumstances, whether the officer in light of all of those circumstances, taking into account the totality of circumstances, whether he acted reasonably, those are the facts for a jury to decide. Thank you very much. We've taken over your time. Thank you for a couple of minutes. I wish the court good morning. My name is Gene Iredale. I represent Mr. Thomas together with Mervyn Lazarus, who wrote the brief. Actually, I think this case suggests that policemen in their work should be akin to scientists. That is to say they use the empirical method as opposed to on the basis of some a priori characterization that has nothing to do with the actual facts on the ground. They make a predetermined decision that has no basis in the facts as they actually exist. Mr. Iredale, can I ask you this? Let's skip ahead to the, let's give you the, the position that there was a constitution, the violation of constitutional right by searching, right? Let's go to qualified immunity. Can you cite any case by a circuit court or even a district court that says that in a response to a domestic violence call, it is a violation of constitutional law to search the alleged perpetrator? In those words, Judge Baya, no. Right. I said, this is what I'm thinking in a different area of the law and under ADPA, which we're not involved with here. The, uh, in, in carrier versus Mousladen, we had a case where, uh, victims relatives were wearing buttons at trial of, uh, the defendant, uh, showing that they were aligned with the, with the victim. And, uh, we held as a, as a court that, uh, that was a violation of due process. That was reversed by the Supreme court on the grounds that there was no clearly established Supreme court case dealing with sufficient particularity, not generality, but sufficient particularity with a wearing of buttons or some other type of expression that would perhaps affect the jury. So although ADPA talks about clearly established by the Supreme court, we have similar language in qualified immunity has to be clearly established. Those two words go more or less the same. So I'm looking for some clearly established law case that says that in response to domestic violence calls, and we have Mr. Pellegrino's affidavit, uh, in the record, which shows that, uh, 12.7% of fatalities to policemen, uh, occur in response to, uh, domestic violence calls and 31% of assaults occur in response to domestic violence calls. Uh, is there any case that says that a domestic violence call, um, is not sufficient to provide reasonable suspicion that the perpetrator is armed? There is no case that says the opposite and judge Bay in this regard, I, I have to say the issue of clearly established was, was not really brooded because clearly established was done by Terry versus Ohio and Terry eschewed any categorical or a priori rule. There have been cases judge Bayer though, that say, for instance, that the nature of the crime involved is a legitimate consideration. But even those cases dealing with crimes such as burglary, for example, say that there is no ipso facto or per se rule that it depends upon the facts and circumstances. That's the closest I can come. But let's suppose that the call had been not a domestic violence call, but it had been a bank robbery call, right? Wouldn't it be the nature of the call? Wouldn't that be sufficient to raise a reasonable suspicion that a person who's committed a bank robbery was armed and armed? And let's say, let's go further and say it's an armed robbery. No, they didn't say, they didn't say it was an armed robbery. They just say it was a bank robbery. Investigate a bank robbery. You think that the nature of the call there would say it would allow a reasonable officer to say, well, this guy may be armed. I would say it gets you 95% of the way, but it doesn't get you all the way because the officer is required to deal with the particular circumstances. So for instance, you have to deal with the particulars of the call. Suppose the call is that it was a six foot man with a lot of freckles and you've stopped somebody who's 5'8 and he has two moles. Does that constitute or amount to a reasonable or found it suspicious justifying, not simply a stop to inquire, but a search for weapons, which is, as Judge Fischer pointed out, an entirely separate inquiry. The issue here, and the law has been crystal clear for 50 years since Terry versus Ohio, which I believe was 1966 or 67. 68. And Terry is clear and has been repeated a million times by this court and other courts. What is required for a weapons pat down? And in that regard, by the way, the Supreme Court, although they called it a frisk or pat down, and that's the language we use, stop and frisk. They said it is a fourth amendment search. And the language we quoted in the brief, as a matter of fact, talks about the indignity, the humiliation, the public nature of such an act. And in this case, remember, the officer did something in a particularly humiliating way. He said to this young man, get down on your knees so I can pat you down. After, of course, he said, may I have consent? And what led him to pull his taser and hold it on this young man and call another officer to come in, who then pointed a pistol directly at his center mass, is that the young man had the temerity to say, no, I didn't do anything wrong. No, you can't search me. And I don't know if the court has had a chance to see the exhibit, which is the actual video of what happened, which is of some moment in that it shows the behavior of the participants. Now, it only shows the behavior of Dillard. That's the problem. It also shows the behavior of Amy Husky, the girlfriend who is sitting there at the side, the supposed victim of what counsel has chosen inaccurately in light of this record to say is domestic violence. It shows that she was demonstrating with the police officer because of the dangerousness of his conduct. This is an officer who managed to take I watched this video. It's like watching Elvira Madigan followed by a horror film. You see two people skipping down this road watching their shadows and the push. There's no jury here. I'm sorry, Judge, but I just got excited because it reminded me of my youth. So I beg your pardon. But he hugged her from behind. That was the push. He hugged her. Now, mind you, Dillard wasn't told that. But what Dillard was told was not that there was a domestic violence incident. He was told that go to this place. There was a man in a purple shirt pushing a woman. That was it. The words domestic violence weren't used on that broadcast. He never testified to that. So you have a situation where he did testify that I've read his testimony and he said it was described as a domestic violence call. The first call that he got. Well, may I just address that, Judge Fisher, with your permission? That was a rhetorical question on my part and invited a response. So go ahead. First of all, your honor, I think in the first question this morning asked the question, how do you say the first call in any way related to the second? Well, the answer is there's nothing in the record that says it did. That was an argument of counsel at the time of the summary judgment motion that he raised that because they realized they had such a terrible case. The deposition of Officer Dillard contains not one single suggestion from him that in his mind he connected the two calls. They were separated in time by at least, I submit to you, 35 minutes. He received the first one at 342 and the second one could not have come in before 412 and probably not till 415 or 416. He arrived on the scene at about 419 and he was pointing his taser within 40 seconds of his arrival. No, that. Well, OK. I'm sorry. Within 40 seconds of the time he first spoke with Mr. Thomas. He arrives on the scene and then I think is it. No, that's a conflict in his testimony because at one point he's saying he repeated the request or the demand for a search for six minutes. He did because what you watch on the tape is what happened is he went there. He said he saw no indications that there was domestic violence. That was his testimony at pages 167, 168 and page 187 of the excerpt of record. He said he saw nothing visible in the conduct or behavior of Mr. Thomas that led him to feel that he had the right to search him. But what happened is after Mr. Thomas said, no, you may not search me. He pulled his taser and he held it on him for six minutes. That's the case. During that six minutes, he called the Escondido Police Department and then another officer, Officer Holtz arrives. She sees him trained like this and then pulls out her gun and holds it directly at the plaintiff. You've said that and we know it. Yes. We've watched the video. Yeah, you have seen it. It just seems to me that on the law, the district court's decision was absolutely right. That the law was crystal clear and has been established. That this is a case in which there was no evidence of domestic violence. There was issue possibly of a misdemeanor. Let's assume, let's assume for a moment that Dillard had a good faith belief that this was a domestic violence type of crime. And that as we recognize in Matos, that domestic violence crime does account for circumstances, account for significant police fatalities or assaults. And under the circumstances that the officer would feel in danger if he left the situation unresolved as to whether or not Mr. Thomas actually had a weapon. And that that was his sole purpose of trying to resolve the situation before he decided that this was a pass, there was no crime. In fact, he said there was no crime in being where they were. But he was uncertain enough that he wanted to be sure that Thomas was not armed. Where, is that beyond debate that at this point? Is that beyond debate that he couldn't have been justified in thinking that that was the appropriate follow-up to what was a justified stop under the Terry language? But he would be leaving a danger unresolved? May I just ask to make sure I understand the nature of the inquiry? Judge Fisher. In other words, the question is, if at the end of this encounter. Yes. He was satisfied everything was fine, but he still wanted to search for weapons. No, he was not satisfied. He was satisfied that there was no ongoing threat to Miss Husky. That there was no assault likely to resume or the like. But that he was not satisfied that Thomas wasn't armed. Then let me say. The second step in Terry. Yes, the answer is, the answer is to go back to Terry and the 10,000 cases that have cited it since, which is. So Terry doesn't help because Terry was a stick up, as the opinion says. And they said in the case after reciting the threats to police officers safety and the balance they were striking says this was a stick up for the nature of the crime itself. Justified the pat down because of the suspected crime is a robbery. OK, so now we have here in his mind, this is a highly charged type type of potential crime, an assault on a woman. And therefore, is it beyond debate that he couldn't have had a reasonable suspicion of potential armed that he needed to defuse before he could clear the scene? Let me answer the question in two ways. In the abstract, in the abstract, if there were facts that arose during the course of his discussion that gave him a reasonable suspicion to believe that the person was armed and dangerous, I don't quarrel that he could have searched the person even at the end of the encounter. On the other hand, if regardless of the nature of the offense and to jump from, I saw a man pushing a woman to this dread category of domestic violence, which apparently has in counsel's mind the ability to repeal the Fourth Amendment for a huge category of allegations. In the absence of specific articulable facts that the person is armed under the Constitution and under the law as it exists now and existed then, he had no right to search. There had to be specific articulable facts that justified a reasonable suspicion. And well, I've gone beyond my time and I apologize. No, that's fine. Thank you very much, Mr. Rydell. Yeah, we'll give you a couple of minutes of rebuttal if you'd like. Yes, thank you. I believe that the discussion that the court is having goes right to the issue of whether this is a clearly established right. In other words, in the situation of asking for the cases and saying, all right, we have a situation where the officer says, I have this call involving domestic violence. We have confirmation from the community service officer that the call involves domestic violence. We have the issue of the man in the purple shirt pushing the woman. When he goes to that scene, is it clearly established that he does not have the right with the totality of the circumstances here to make sure that that scene is safe, which includes the opportunity to frisk the individual? Counsel just answered your question because he had talked about the clearly established law of articulable specific facts. I'm still waiting for your articulable facts that establish why he needed to search on this scene in light of all of the facts. You keep going back to the label domestic violence and the corroboration of domestic violence and you're refusing, other than the description, to say anything other than that he had a shirt over his belt line. You haven't talked about any of the other facts. So I think that's the clearly established law that you are eliding. The facts include him matching the description of the individual who was pushing a female at the time. I believe that's critical and that's very important. In other words, the issue is the totality of circumstances. With the information he has, could he make a Terry stop? And in Terry, the 1968 case, the officer was in downtown Detroit. I'm sorry, downtown Cleveland. I apologize. You're absolutely right. He saw individuals in a high crime area of the downtown area. Nobody's quarreling with the right to stop, counsel. We've all been talking. I'm trying to focus on the search. But even in Terry, he thought they may be casing someplace and he went to interview them and then he thought, based upon the interview and not getting the right response, he then twisted Mr. Terry around because he wanted to do the frisk. That's what happened. The court said you have to take a look at what an objective, reasonable officer in that situation might be thinking based upon the circumstances and the circumstances here with the purple shirt, with the pushing of the woman, with the information he had been provided on the call. Remember, he didn't see the video. He didn't see the video of what was going on beforehand. His information was, I got information that this is domestic violence. I got information that a man in a purple shirt is pushing a woman. So he goes up to that situation and shouldn't he have the right to stop and frisk in that situation? I believe that the law is he has the right to stop and frisk. He may not have the ability to do anything further than that. But the facts of this case that I've just described provide that. All right. Thank you very much. All right. The case of Thomas versus Dillard is submitted.
judges: Fernandez, Fisher, Bea